UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| ROGER BITTINGER and | : | |
| LILIAN BITTINGER, | : | |
| | : | Civil Action No. 14-1255 |
| Plaintiffs | : | |
| | : | |
| | : | Connecticut Superior Court, |
| v. | : | Judicial District of New London |
| | : | KNL-CV14-4012480S |
| WELLS FARGO, N.A. and NATIONAL | : | |
| FIELD REPRESENTATIVES, INC. | : | |
| | : | |
| Defendant | : | SEPTEMBER 20, 2017 |

## **PLAINTIFFS' MOTION TO AMEND COMPLAINT**

Pursuant to Rule 15 of the Federal Rules of Civil Procedure and Local Rule 7(f) of the Local Rules of Civil Procedure, the Plaintiffs, Roger Bittinger and Lilian Bittinger, hereby move the Court to amend their Complaint in accordance with the Fourth Amended Complaint filed herewith.

This Fourth Amended Complaint seeks to modify the Second Amended Complaint [Doc. 48] by alleging that the mortgage servicer guide that was applicable to Plaintiffs' mortgage was the U.S. Department of Veteran's Affairs VA Servicer Guide ("VA Servicer Guide"). As currently pled, the Complaint erroneously identifies the Freddie Mac Single Family/ Single-Seller Servicer Guide ("Freddie Mac Servicer Guide") as the applicable guide.[1] While the two guides are similar, this amendment sets forth the identity and relevant provisions of the applicable VA Servicer Guide, replacing similar references made to the Freddie Mac Guide. In addition, this Fourth Amended

---

[1] The defendants did not assert any defenses relative to the applicability of the Freddie Mac Single Family/Single-Seller Service Guide and it has only been through the course of pleadings and discovery in the related state court action that Defendant NFR's subcontractor has made reference to the U.S. Department of Veteran's Affairs VA Servicer Guide.

Complaint removes the text of the breach of contract and ordinary negligence counts against Wells Fargo, which said counts were dismissed by the Court on or about July 21, 2016.

In accordance with Local Rule 7(f), filed herewith is a redlined version of the proposed amended pleading, which shows the changes proposed against the current pleading.

In accordance with Local Rule 7(f), counsel for the movants has inquired of all non-moving parties and counsel for both defendants and has not yet received a response to whether they object to this motion.

Dated at New London, Connecticut this 20th day of September, 2017.

Respectfully Submitted,
PLAINTIFFS, ROGER BITTINGER and
LILIAN BITTINGER

By: _____/s/_____
MICHAEL S. BONNANO, Esq,
GERAGHTY & BONNANO, LLC
38 Granite Street,  P. O. Box 231
New London, CT 06320
(860) 447-8077 / Fax (860) 447-9833
(Federal ID #Ct25847)
Attorney for ROGER BITTINGER and
LILIAN BITTINGER

## CERTIFICATE OF MAILING

The undersigned hereby certifies that on the 20th day of September, 2017 a copy of the foregoing was filed electronically and served by mail upon anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this fling through the court's CM/ECF System.

_____/s/_____
MICHAEL S. BONNANO, Esq.
GERAGHTY & BONNANO, LLC
38 Granite Street, P. O. Box 231
New London, CT 06320
(860) 447-8077/Facsimile (860) 447-9833
(Federal ID #Ct25847)

ROGER BITTINGER and : 
LILIAN BITTINGER, : 
                        :          Civil Action No. 14-1255
        Plaintiffs : 
                        : 
                        :          Connecticut Superior Court,
v.                      :          Judicial District of New London
                        :          KNL-CV14-4012480S
WELLS FARGO, N.A. and NATIONAL : 
FIELD REPRESENTATIVES, INC. : 
                        : 
        Defendant :          SEPTEMBER 20, 2017

## PLAINTIFFS' FOURTH AMENDED COMPLAINT AND JURY DEMAND

## I.  PRELIMINARY STATEMENT

This matter was commenced in Connecticut Superior Court as a wrongful entry and detainer action pursuant to Connecticut General Statutes §47a-43.  The Defendant, Wells Fargo Bank, N.A. filed a Notice of Removal pursuant to 28 U.S. C. §§ 1331 [federal question], 1332 [diversity of citizenship and amount in controversy], 1367 [supplemental jurisdiction], 1441 and 1446 [removal].  On March 23, 2015, the Defendant Wells Fargo Bank, N.A., (hereinafter "Wells Fargo") filed a Motion to Dismiss the Plaintiffs' Amended Complaint in its entirety. [Doc. 30]  On April 30, 2015, the Defendant National Field Representatives, Inc. (hereinafter "NFR"), filed its own Motion to Dismiss, directed at the Tenth, Thirteenth, Fourteenth, Fifteenth, Seventeenth and Eighteenth Counts, of the Amended Complaint. [Doc. 40]  The Court held a hearing on the Defendants' motions on August 24, 2015, ruling from the bench that the counts directed against Wells Fargo be dismissed *en toto* and with prejudice as to all counts except with respect to the negligence count.  The court also ruled in favor of NFR's Motion to Dismiss, leaving those counts

not included in NFR's motion remaining against NFR.  On or about September 24, 2015, Plaintiffs filed their Second Amended Complaint, raising claims of breach of contract, negligence, and negligent hiring, training, and/ or supervision against Wells Fargo, and repeating claims of conversion, statutory theft, and negligence against NFR.  [Doc. 48].  Both Defendants filed Motions to Dismiss all counts of the Second Amended Complaint pled against them.  [Doc. 57 and Doc. 66].  On or about July 21, 2016, the Court entered its Order dismissing the counts asserting breach of contract and ordinary negligence against Wells Fargo, and denying NFR's motion to dismiss.  [Doc. 75].  On or about October 21, 2015, Plaintiffs filed its Third Amended Complaint [Doc. 53] and Motion for Joinder of Defendant, Home Team Property Services, LLC (("Home Team") [Doc. 52].  On or about November 23, 2015, the Court denied Plaintiff's Motion for Joinder and struck Plaintiff's Third Amended Complaint [Doc. 53], ruling that Home Team was not a necessary party and the Second Amended Complaint [Doc. 48] would remain the operative Complaint.  [Doc. 64]  On March 2, 2016, Plaintiffs commenced a separate action against Home Team in Connecticut Superior. As a result of a recent filing by Home Team in the State Court action, Plaintiffs discovered that their operative Complaint, which alleges that Defendants failed to adhere to the applicable Mortgage Servicer Guide, alleged that the incorrect guide was applicable to the Plaintiffs' Mortgage.[1]  Plaintiffs hereby submit this Fourth Amended Complaint to ensure that the appropriate Mortgage Servicing Guide, and the relevant provisions, are referenced in its Complaint.

---

[1] Plaintiff's operative Complaint alleges that the Freddie Mac Single Family/ Single-Seller Servicer Guide was applicable to Plaintiffs' Mortgage, however, it is the U.S. Department of Veteran's Affairs VA Servicer Guide that is applicable.

This Fourth Amended Complaint also removes the text of the breach of contract claim and ordinary negligence claim pursuant to the Court's Order [Doc 75].

## II.  JURISDICTION AND VENUE

As a result of the original removal of this action to this court, and upon this court's ruling on the defendants' motion to dismiss the action, Jurisdiction in this matter is based on diversity of citizenship pursuant to 28 U.S.C. § 1332.      Venue is proper in this district under 29 U.S.C. § 1391(b) because the acts giving rise to this action occurred in substantial part in this district.

## III.  PARTIES

1.      The Plaintiffs, Roger Bittinger and Lilian Bittinger, (hereinafter referred to as the "Bittingers" and alternatively the "Plaintiffs") are individual consumers over the age of eighteen (18) years and have at all times relevant resided in this district.

2.      The Defendant, Wells Fargo states in its removal papers that it is a National Association federally chartered with the Office of the Comptroller of Currency of the United States Department of the Treasury and a citizen of South Dakota, maintaining its main office in Sioux Falls, South Dakota.

3.      National Field Representatives, Inc. (hereinafter "NFR") is a New Hampshire Corporation, that at all times relevant hereto, was doing business as itself and through its agent(s) in New London County, Connecticut.

## IV.  FACTS RELEVANT TO ALL COUNTS

4.      At all relevant times the Plaintiffs, Bittingers were the owners of a certain single family residence located at 2 Mohegan Road, Norwich, Connecticut (the "Premises").

5.      On or about October 10, 2008, Wells Fargo filed a Writ and Summons in the Connecticut Superior Court, Judicial District of New London at New London sounding in foreclosure against the Bittingers, bearing a return date of October 28, 2008 and having been assigned a docket number of CV08-5008936S[2] (the "foreclosure").

6.      The foreclosure was an action to foreclose Wells Fargo's "Open-End Mortgage Deed" ("Mortgage") that Wells Fargo held on the Bittingers' home, which they owned, located at 2 Mohegan Road, Norwich, Connecticut (the "Premises").

7.      Wells Fargo was required to follow Connecticut statutory and civil procedure in foreclosing the Mortgage against the Bittingers' interest in their home.

8.      A copy of said Mortgage is attached here to Exhibit A.

9.      The Mortgage form (Exhibit A) is the Connecticut Single Family-Fannie Mae/Freddie Mac uniform form.

10.     The Mortgage created a legal relationship between the Bittingers and Wells Fargo, wherein the Bittingers were "Borrowers" and Wells Fargo the "Lender" under its' terms.

11.     Wells Fargo was the servicer under this Mortgage which secured the corresponding Note referenced in the Mortgage.

12.     As the loan secured by the Mortgage was a VA loan, Wells Fargo, including its agents and employees, were subject to, and required to follow the U.S. Department of Veterans Affairs VA Servicer Guide ("Guide"), which provides, inter alia, guidelines and regulations pertaining to the servicing of qualifying mortgages, such as the Bittingers' Mortgage in this matter.

---

[2] Lilian Bittinger is referred to as Lillian Bittinger in the foreclosure.

13. The Guide is a reference tool used by servicers, such as Wells Fargo, to set out, among other things, the protocol to follow in servicing VA loans. It is designed to afford protection not just to the servicer (Wells Fargo) but also to the borrowers (the Bittingers).

14. In addition to the Guide, the Department of Veterans Affairs issues "circulars" to provide national guidance and describe the minimum requirements for the inspection of properties securing VA-guaranteed home loans and the maintenance, preservation, and repair of any properties found to be abandoned.

15. VA Circular 26-09-12 was the applicable servicing guide for property preservation services on the Plaintiffs' Mortgage.

16. Annex 12 of the Guide sets forth the VA Property Preservation Requirements, and its provisions are virtually the same as those set forth in VA Circular 26-09-12.

17. Wells Fargo is aware of the Guide and that it is required to follow its instructions pertaining to servicing consumer mortgages.

18. The Guide contains several provisions and protocols for servicers to follow when certain circumstances surrounding the mortgaged property arise, including but not limited to the suspected abandonment of mortgaged property, and how to proceed upon the suspicion of the same.

19. The Guide contains a glossary of terms, and defines "abandonment" as follows: "The release of a claim or right to a property with the intention of terminating ownership and without giving it to anyone else."

20. The Guide also provides that a property is "abandoned" where "[it] is vacant, is not being maintained, and is not offered for sale or rent, and there has been no contact with the current

owner." It likewise provides that a property is "vacant" where the "Property is not being occupied by anyone but appears to be maintained and is secure.

21.     The Guide sets forth a process for the servicing of delinquent VA loans. In the event of a delinquency, Section 4.2.1 of the Guide requires the servicer to contact the borrower to establish the borrower's intent with regards to the property.

22.     VA Circular 26-09-12 and the Guide provide that, if the servicer receives advice that a property is vacant and unsecured, it shall make "appropriate arrangements to protect the property" from unnecessary deterioration due to vandalism or the elements due to neglect. It requires that an inspection be immediately scheduled and completed to document the condition of the property, in order to verify if the occupants have abandoned the property.

23.     In making the determination as to whether the property is vacant or abandoned, VA Circular 26-09-12 provides that "[a]ll circumstances should be considered." As an example, it indicates that the absence of personal property may indicate that the property has been abandoned.

24.     If the servicer determines the property to be vacant and abandoned, the Guide directs the servicer to protect and preserve such property. It also mandates that the servicer comply with various reporting requirements.

25.     The Mortgage contains the several provisions that the Bittinger's, as the "Borrowers" and Wells Fargo, as the "Lender", must adhere to.

26.     Among other terms and conditions found in the Mortgage, the Mortgage also contains the following provisions:

> a. [Section 7, in relevant part (emphasis added)]: Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property.

6

Lender *shall give Borrower notice at the time of or prior* to such an interior inspection *specifying such reasonable cause*.

b. [Section 9 (emphasis added)]: **Protection of Lender's Interest in the Property and Rights Under this Security Instrument**. If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument; (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (Such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is *reasonable or appropriate* to protect Lender's interest in the Property and rights under this Security Instrument , including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9

27.     Wells Fargo and the plaintiffs were both subject to the terms of the Mortgage upon the date of execution.

28.     Further, in the State of Connecticut, our Supreme Court has stated that a "mortgage is regarded as mere security" for the note.  See *Town of Groton v. Mardie Lane Homes, LLC,* 286 Conn. 280, 290, 943 A.2d 449 (2008).  Therefore, a home owner's rights to title and possession take priority as the superior title holder to a mortgagee, and any contractual term in derogation of those rights, would be in violation of Connecticut law.

29.     The Mortgage applied only to the real property its improvements and was not additionally secured by the Bittingers' personal property.

30.     Throughout much of the foreclosure action the Bittingers resided in the house on the Premises, and at all times kept their valuables and personal property in the house, and areas or buildings appurtenant thereto.

31.     Roger Bittinger appeared in the foreclosure.

32.     Throughout the foreclosure process, the Bittingers were desirous to maintain and save their home from the foreclosure.

33.     To that end, they engaged in the court-ordered and statutorily required foreclosure mediation process with Wells Fargo.

34.     The Bittingers engaged in this process with Well Fargo for a period of over thirty (30) months (2 ½ years).

35.     Wells Fargo was also an active participant in the mediation process, consenting to a multitude of extensions to the mediation period and filing its own motions for such extensions of the mediation sessions with the Bittingers.

36.     Throughout the mediation process, Wells Fargo learned that the Bittingers were both disabled people that had fallen behind on their mortgage payments, due in part, to their disability.

37.     Wells Fargo also learned that Mr. Bittinger was a two time Veteran of foreign war, and suffered from Post-Traumatic Stress Disorder (PTSD) from his service to our country.

38.     Wells Fargo continued its participation in the mediation process and did not object to it taking place.  A copy of the state court docketing sheet of the Bittinger's foreclosure action is attached hereto as Exhibit B.

39.     On numerous occasions, through many mediation sessions, with the court-appointed mediator, the Bittingers informed Wells Fargo of their desire to stay in their home and save it from foreclosure.

40.     In fact, Wells Fargo and the Bittingers worked together to attempt to save the Bittingers' home from foreclosure and work out an arrangement to permit the plaintiffs to remain in their home.

41.     Between the parties' cooperation, the plaintiffs and Wells Fargo moved for extensions and modifications of the mediation period at least *twenty-seven* (27) times.  See Exhibit B.

42.     Upon information and belief, Wells Fargo, had the Bittingers' telephone number and email address and was able to communicate with the Bittingers without issue.

43.     In fact, the Bittingers regularly spoke with representatives and employees of Wells Fargo to inform them of their progress in the mediation session and, as the mediation session failed, the status of their possession of the property.

44.     Upon information and belief, there were no known impediments between Wells Fargo and the Bittingers communicating with one another, and in fact, they communicated regularly throughout the foreclosure and mediation process.

45.     Upon information and belief, the plaintiffs were not difficult to get ahold of, absent from mediation sessions or tardy in their obligations to turn documents over to Wells Fargo as the foreclosure process continued.

46.     The Bittingers stated to Wells Fargo that their belongings remained in their home, even though they were seeking a new residence as the foreclosure progressed.

47.     The Bittingers never stated to Wells Fargo their intent to abandon their home or acknowledged that they had in fact abandoned their home and their belongings therein.

48.     After years of trying, the mediation attempt was ultimately not successful between the plaintiffs and Wells Fargo, resulting in the entry of judgment of strict foreclosure per order of the Court (Cosgrove, J.) on January 6, 2014.

49.     By order of the court in the foreclosure (J. Cosgrove), the court gave the Bittingers, as owners of the equity of redemption, until April 1, 2014 to exercise their rights of redemption in the Premises.

50.     The Bittingers maintained equitable title at all times prior to their law day passing.

51.     In addition to enjoying the equitable title to their home, the Bittingers maintained actual, peaceable possession of the Premises throughout all times relevant hereto.

52.     Understanding that they were not likely going to be able to raise the funds necessary to reinstate their Mortgage with Wells Fargo, or sell their home to generate enough proceeds to pay off the Mortgage, the Bittingers began to search for suitable replacement housing.

53.     The plaintiffs communicated to Wells Fargo that they were seeking new housing as the law date for the foreclosure was approaching.

54.     During this period of time, they kept their belongings in their home and checked on them frequently, as well as taking all reasonable steps to protect their home during this process.

55.     In about February 2014, Wells Fargo, or an entity acting on its behalf, posted a notice on the Property indicating that the servicer, or its agent, believed the premises to be abandoned or vacant, and stating that the property would be secured thereafter if the borrowers did not contact Wells Fargo to indicate otherwise.  Thereafter, but prior to March 1, 2014, the

Bittingers communicated with Wells Fargo that they had not abandoned their home and that their belongings still remained within the property.

56.    On or about March 15, 2014, during one of the plaintiffs' routine inspections of their home and their belongings, the Bittingers' came upon their home and found the locks to be changed.

57.    The plaintiffs also found evidence that forcible entry had been committed upon their home.

58.    The plaintiffs were blocked and locked out from entering their home.

59.    Wells Fargo, failed to take reasonable steps to inform the plaintiffs that they were undertaking steps to take control of the plaintiffs' home.

60.    In fact, upon information and belief, the only step that the plaintiffs understand Wells Fargo, through its own actions or that of their agent or contractor, took was placing a notice sticker on the premises.

61.    Said notice sticker is wholly inadequate for reasonable notice under these circumstances, due to (but not limited to) the following facts:

     a.  The entire premise of Wells Fargo's right to enter the plaintiffs' home is the fact that it suspected the Premises was abandoned.  Therefore, it is unreasonable to have the only way Wells Fargo attempts to notify the plaintiffs of its intent to secure the premises, be the placing of a sticker on the very house they believed to be abandoned.

     b.  Moreover, Wells Fargo and these plaintiffs were involved in years of litigation and mediation sessions with one another.  Communication was commonplace

and undeterred. Wells Fargo had the plaintiffs' contact information (phone numbers and email addresses) and regularly communicated about the status of the foreclosure and the plaintiffs' continued possession of their home.

62. In addition to this, after Plaintiffs indicated to Wells Fargo that they had not abandoned the home, Wells Fargo never informed the plaintiffs or put them on notice that Wells Fargo believed it had reasonable cause to inspect the interior of the plaintiffs' home prior to their or their agents or contractors entry upon the interior of their home.

63. Wells Fargo further failed to notify or reasonably attempt to notify the plaintiffs of the basis for its alleged reasonable cause to enter the plaintiffs' home.

64. Wells Fargo employed or hired, either as its agent or as an independent contractor, NFR to effectuate the locking out of the Bittinger's from their home.

65. Wells Fargo has used NFR for this purpose before, on multiple occasions, in multiple locations within multiple states.

66. Wells Fargo also routinely hires companies like NFR to perform the same type of service for them.

67. Upon information and belief, Wells Fargo then directly instructed NFR, to secure the Bittingers' home, by doing one or more of the following acts:

    a. Notifying NFR that Wells Fargo believed that the plaintiffs' home was abandoned;

    b. Then based upon this belief, communicating to NFR that Wells Fargo desired it to go out and secure the Bittingers' home;

c. Discussing and setting with NFR a time-table by which this act was to be conducted;

d. Instructing NFR to place a notice on the Bittingers' door regarding the notice of the abandonment and lock out;

e. Indicating to NFR that Wells Fargo believed it had the authority to authorize NFR to lock the Bittinger's out of their home based upon the rights conferred to Wells Fargo only (and not to NFR), in the Mortgage;

f. Reviewing and becoming aware of NFR's procedures to conduct this type of act to ensure it is done in accordance to a level of protocol acceptable to Wells Fargo, and;

g. Compensating NFR for the completion of the acts NFR committed upon the plaintiffs' property.

68. NFR accepted its role and direction from Wells Fargo and acted pursuant to that understanding, including understanding that Wells Fargo ultimately controlled the actions pertaining to their actions to lock out the plaintiffs from their home.

69. NFR acted upon this role as Wells Fargo's agent and/or contractor.

70. Pursuant to this, NFR then, through its own actions or through the actions of its agent and/or contractor, took steps to break into the plaintiffs' home and lock the plaintiffs out of it.

71. Wells Fargo benefitted by the actions of NFR or its agents and/or contractors by NFR's acts to secure the Premises Wells Fargo believed abandoned, thereby, in Wells Fargo's estimation, protecting their interest in the Premises.

72.     This was despite the fact that Wells Fargo knew or should have known that the plaintiffs were no longer in their home on a daily basis by virtue of the fact that the foreclosure process was under way, and they were in the process of moving their belongings to their new home.

73.     Upon information and belief, NFR believed it had the authority to enter the plaintiffs' home based upon the representations of said right and authority given to it by Wells Fargo.

74.     Upon information and belief, upon the changing of said locks, prohibiting the plaintiffs' from entering into their own home and excluding them from access to their own possessions and property, the only entities with access to the plaintiffs' home were Wells Fargo and NFR, their agents or contractors.

75.     Both defendants were then in control and possession of the plaintiffs' personal property and home, specifically to the exclusion of the plaintiffs.

76.     As such, the defendants were the only parties capable of protecting the plaintiffs' belonging from theft or damage.

77.     At the time that NFR, through its actions or the actions of its agent or contractors and upon the authority given to it by Wells Fargo, entered upon the plaintiffs' home, it observed, as any reasonable person would, that the plaintiffs' personal property remained in the home and it had, in fact, not been abandoned.

78.     Upon observing this, neither NFR nor Wells Fargo made any reasonable attempt to telephone, email or write the plaintiffs to inform them that the lock-out had taken place and that

their belongings were no longer available to them without first obtaining consent and permission from NFR or Wells Fargo to enter into their own home.

79.     Upon discovering that they had been locked out, the plaintiffs immediately contacted Wells Fargo to determine what change had occurred to result in them not being permitted into their own home and able to take possession of their own personal property.

80.     Upon information and belief, an employee of Wells Fargo admitted to the plaintiffs that Wells Fargo had incorrectly believed that the home had been abandoned and that it had taken steps to effectuate the locking out of the Bittingers from their home.

81.     Unable to enter their own home without breaking into it and causing further damage, the plaintiffs were required to wait until Wells Fargo delivered to them keys allowing them to reenter their own home.

82.     During that period of time, Wells Fargo and NFR maintained control of the plaintiffs' home and custody of their belongings, to the exclusion of the plaintiffs.

83.     During that period of time, the defendants owed a duty to the plaintiffs' to protect and keep reasonably safe the plaintiffs' personal property and valuables.

84.     The plaintiffs were eventually sent a new set of keys from Wells Fargo, to allow them entry into their own home.

85.     It was then that the plaintiffs' discovered that many of their belonging were damaged and/or stolen, including but not limited to:

      a.   Their safe being destroyed and pried open;

b. Jewelry, cash valuable coins, watches, wedding rings and other items belonging to the Bittingers were stolen, many of which were irreplaceable family heirlooms;

c. The container holding Mr. Bittingers' father's ashes had been molested and disturbed;

d. Camera equipment;

e. Various clothing;

f. Various electronics;

g. Assorted military memorabilia collected by Mr. Bittinger's over his 22 years of military service, and

h. Damage to the property was observed.

86. Upon information and belief, the theft of the plaintiffs' items occurred while they were locked out of their home and while the Premises was under the exclusive control of the defendants.

87. This is due to the fact that the plaintiffs were visiting their home with enough frequency, care and regularity that they would have noticed that their items were stolen prior to the date when the defendants undertook the efforts to lock them out of their own property. Every time the plaintiffs visited their home, they left it in order, with the possessions that were stolen, left intact on the premises.

88. This incident, among other things, caused the plaintiffs to have to move the foreclosure court to extend the law date in order to afford the plaintiffs additional time to move their belongings out and responsibly turn over possession to Wells Fargo.

89.     The Bittingers moved to open the judgment of the foreclosure on March 24, 2014 which was granted and extended their law day and rights to actual and peaceable possession of the premises through July 1, 2014 (Cosgrove, J.).

90.     Upon the Bittingers becoming aware of this unlawful entry and removal of their personal property the Bittingers filed a report with the local police.

91.     The Bittingers contacted representatives of Wells Fargo and protested the actions of Wells Fargo and its agents to no avail.

## V.  CAUSES OF ACTION

**FIRST COUNT:   As to Wells Fargo Bank, N.A. (Negligent Hiring, Training and/Supervision)**

1-91.    Plaintiffs, Bittingers, reassert each and every allegation contained in Paragraphs 1 through 91 of this Amended Complaint, and incorporate the same as if set out in full herein.

92. Wells Fargo holds and services a large number of mortgages across the country.

93.     As such, Wells Fargo handles numerous judicial foreclosures that span across several states.

94.     A routine process of servicing mortgages and litigating foreclosures is to take possession of a borrower's home, such as the Bittingers' home in this matter.

95.     Wells Fargo often employs the services of a third party, either as agent or contractor, to assist them in securing a borrower's home, either pre- or post-foreclosure.

96.     Wells Fargo is aware of past incidences where said third parties employed by them to secure the properties, have been accused of stealing from the home owners.

97.     Upon information and belief, they have also been involved with litigation that involved NFR and accused both Wells Fargo and NFR of conduct such as conversion, negligence, theft, and trespass.

98.     Therefore, Wells Fargo was aware or should have been aware that there is a degree of propensity for this type of behavior to take place when employing a third party to exercise their held rights under the Mortgage contract.

99.     Wells Fargo had an obligation and legal duty to the plaintiffs, as consumers, borrowers, and owners of the personal property they were going to affect, to select and review the experience, suitability, and fitness for the job, and overall competency of its employees, agents and contractors.

100.    Wells Fargo owed a duty to the plaintiffs to evaluate and supervise the quality, interaction and services performed and rendered at their direction and on their behalf by third parties, and that Wells Fargo knew would contact, interact with and affect the plaintiffs' property rights and access their home and their property.

101.    This duty also stems from the fact that Wells Fargo was aware of and involved in claims against third parties it had hired, including but not limited to NFR, wherein those third parties were accused of conduct similar to what the plaintiffs allege occurred against them in this action.

102.    Upon information and belief, Wells Fargo breached their duties to the plaintiffs by hiring NFR to perform services and take actions on their behalf, including but not limited to failing to ensure that NFR and its employees, agents or contractors were properly trained, experienced,

supervised, competent or capable of following through with Wells Fargo's intent to secure the premises and lock the plaintiffs out of their home.

103.     Further, upon information and belief NFR, its agents and/contractors were not properly instructed by Wells Fargo as to how to undertake possession of the plaintiffs' property to ensure that it was not done in a manner that was in violation of the mortgage contract and applicable law.

104.     Wells Fargo failed to have procedures in place that instructed NFR to make a reasonable determination of whether the property was in fact abandoned and, if it appeared that it was not, take certain actions to notify the plaintiffs.

105.     In addition, adequate safeguards were not put in place by NFR, acting under the instruction and/or supervision of Wells Fargo, to protect the plaintiffs' personal property once Wells Fargo, through the actions of NFR, became custodian of said property.

106.     As a result of this breach, plaintiffs have suffered actual damages and injury in an amount according to proof at the time of trial.

**SECOND COUNT:  As to National Field Representatives, Inc. (Conversion.)**

107.     1-106. Plaintiffs, Bittingers, reassert each and every allegation contained in Paragraphs 1 through 106 of Count One and incorporate the same as if set out in full herein. NFR, on its own behalf or through the action of its agents, representatives or independent contractors took personal property of the plaintiffs, with the intent to keep said property as their own and in derogation of the Bittingers' ownership rights in said property, and said NFR, by its agents, representatives or independent contractors wrongfully detained and wrongfully exercised dominion and control over said property

108.     NFR is liable for the plaintiffs' missing property.

**THIRD COUNT:  As to National Field Representatives, Inc. (Statutory Theft.)**

1-108.  Plaintiffs, Bittingers, reassert each and every allegation contained in Paragraphs 1 through 108 of Count Two and incorporate the same as if set out in full herein.

109.     NFR, its agents, representatives or independent contractors stole personal property of the Bittingers.

110.     NFR is liable to the Bittingers for treble damages pursuant to Connecticut General Statutes §52-564.

111.     NFR's liability for the conduct of its agents, representatives or independent contractors is a result of its failure or indifference to adequately train and supervise them under circumstances in which it could be substantially certain that such illegal conduct would occur.

112.     This conduct has resulted in the plaintiffs' injury.

**FOURTH COUNT:  As to National Field Representatives, Inc. (Negligence)**

1-112.  Plaintiffs, Bittingers, reassert each and every allegation contained in Paragraphs 1 through 112 of Count Three and incorporate the same as if set out in full herein.

113.     As the contractor and/or agent of Wells Fargo, NFR owed a duty to Bittingers to act, or to ensure that any of their agents and/or contractors act, in an appropriate and reasonable manner with regard to the foreclosure of the Premises.

114.     This duty of care is concomitant with the same duties and obligations as Wells Fargo since Wells Fargo's rights stem from the Mortgage contract and their position as lender to the plaintiffs.

115.     NFR by itself or through its agents or independent contractors, breached its duty to the Bittingers by:  failing to acknowledge the fact that the Bittingers' property was still in its redemption period and NFR had no lawful basis for re-keying, entering or removing personal property from the property; failing to act in a reasonably prudent manner after NFR, and/or its agents or independent contractors were aware, or should have been, that the Premises were occupied; and violating its own internal policies which would have required a Court Order before any personal property items were removed, even if the property had not been redeemed.

116.     As a proximate result of NFR's negligence the Bittingers were caused to suffer damages.

## VI.  <u>PRAYER FOR RELIEF</u>

1.      A temporary and permanent injunction enjoining Wells Fargo Bank, N.A. from collection on the note based upon their misconduct in the handling of the foreclosure and the invasion of the plaintiffs' rights as herein alleged.

2.      Compensatory Damages.

3.      Damages as allowed and specified by each relevant Statute;

4.      Treble Damages in accordance with C.G.S. §52-564.

5.      Punitive Damages;

6.      Interest;

7.      Attorney's Fees;

8.      Such other relief as this court deems fair and just.

## VII.   <u>DEMAND FOR JURY TRIAL</u>

In accordance with Federal Rule of Civil Procedure 38(b), Plaintiffs respectfully demand a jury trial of the within action.

Dated at New London, Connecticut this 20th day of September, 2017.

Respectfully Submitted,
PLAINTIFFS, ROGER BITTINGER and
LILIAN BITTINGER

By:      _____/s/_____
        MICHAEL S. BONNANO, Esq,
        GERAGHTY & BONNANO, LLC
        38 Granite Street,  P. O. Box 231
        New London, CT 06320
        (860) 447-8077 / Fax (860) 447-9833
        (Federal ID #Ct25847)
        Attorney for ROGER BITTINGER and
            LILIAN BITTINGER

<u>CERTIFICATE OF MAILING</u>

The undersigned hereby certifies that on the 20th day of September, 2017 a copy of the foregoing was filed electronically and served by mail upon anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this fling through the court's CM/ECF System.

_____/s/_____

MICHAEL S. BONNANO, Esq.
GERAGHTY & BONNANO, LLC
38 Granite Street, P. O. Box 231
New London, CT 06320
(860) 447-8077/Facsimile (860) 447-9833
(Federal ID #Ct25847)

# EXHIBIT A

INSTR # 2004008778
OR BK 02001 PG 0046
RECORDED 10/20/2004 12:51:54 PM
DEE ANNE BRENNAN TOWN CLERK
NORWICH, CT.

Return To:
WELLS FARGO BANK, N.A.
3601 MINNESOTA DRIVE
BLOOMINGTON, MN 55435-5284

Prepared By:
HELEN CHANG
WELLS FARGO BANK, N.A.
800 W CUMMINGS PARK #6000
WOBURN, MA 01801

—————————— [Space Above This Line For Recording Data] ——————————

# OPEN-END MORTGAGE DEED

# NOTICE: THIS LOAN IS NOT ASSUMABLE WITHOUT THE APPROVAL OF THE DEPARTMENT OF VETERANS AFFAIRS OR ITS AUTHORIZED AGENT.

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

(A) "Security Instrument" means this document, which is dated SEPTEMBER 28, 2004 together with all Riders to this document.
(B) "Borrower" is ROGER BITTINGER, AN UNMARRIED MAN AND LILIAN E. BITTINGER, AN UNMARRIED WOMAN

Borrower is the mortgagor under this Security Instrument.
(C) "Lender" is WELLS FARGO BANK, N.A.

Lender is a **National Association**
organized and existing under the laws of THE UNITED STATES

**CONNECTICUT**-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT          Form 3007  1/01

VMP -6G(CT) (0005)
Page 1 of 14          Initials

VMP MORTGAGE FORMS - (800)521-7291

Lender's address is P. O. BOX 5137, DES MOINES, IA 50306-5137

Lender is the mortgagee under this Security Instrument.

(D) "Note" means the promissory note signed by Borrower and dated SEPTEMBER 28, 2004
The Note states that Borrower owes Lender ONE HUNDRED SEVENTY-SEVEN THOUSAND
THIRTY-TWO AND NO/100                                                    Dollars
(U.S. $***177,032.00        ) plus interest. Borrower has promised to pay this debt in regular Periodic
Payments and to pay the debt in full not later than OCTOBER 1, 2034

(E) "Property" means the property that is described below under the heading "Transfer of Rights in the
Property."

(F) "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges
due under the Note, and all sums due under this Security Instrument, plus interest.

(G) "Riders" means all Riders to this Security Instrument that are executed by Borrower. The following
Riders are to be executed by Borrower [check box as applicable]:

| ☐ Adjustable Rate Rider | ☐ Condominium Rider | ☐ Second Home Rider |
| ☐ Balloon Rider | ☐ Planned Unit Development Rider | ☐ 1-4 Family Rider |
| ☒ VA Rider | ☐ Biweekly Payment Rider | ☐ Other(s) [specify] |

(H) "Applicable Law" means all controlling applicable federal, state and local statutes, regulations,
ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final,
non-appealable judicial opinions.

(I) "Community Association Dues, Fees, and Assessments" means all dues, fees, assessments and other
charges that are imposed on Borrower or the Property by a condominium association, homeowners
association or similar organization.

(J) "Electronic Funds Transfer" means any transfer of funds, other than a transaction originated by
check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic
instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit
or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller
machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse
transfers.

(K) "Escrow Items" means those items that are described in Section 3.

(L) "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid
by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i)
damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the
Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the
value and/or condition of the Property.

(M) "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default on,
the Loan.

(N) "Periodic Payment" means the regularly scheduled amount due for (i) principal and interest under the
Note, plus (ii) any amounts under Section 3 of this Security Instrument.

(O) "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its
implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to
time, or any additional or successor legislation or regulation that governs the same subject matter. As used
in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard
to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage
loan" under RESPA.



-6G(CT) (0005)                    Page 2 of 14                    Initials                    Form 3007  1/01

**(P) "Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower in consideration of this debt does hereby grant and convey to Lender and Lender's successors and assigns, the following described property located in the COUNTY                                    of NEW LONDON                                    :

      [Type of Recording Jurisdiction]                              [Name of Recording Jurisdiction]

LEGAL DESCRIPTION IS ATTACHED HERETO AS SCHEDULE "A" AND MADE A PART HEREOF.

Parcel ID Number: **N/A**                                    which currently has the address of
**2 MOHEGAN ROAD**                                                              [Street]
**NORWICH**                                        [City] , Connecticut **06360**              [Zip Code]
("Property Address"):

    TO HAVE AND TO HOLD this property unto Lender and Lender's successors and assigns, forever, together with all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property."

    BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to mortgage, grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

    THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

    UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

    **1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S.

currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

**2. Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

**3. Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be



in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

**4. Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the

lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with

-6G(CT) (0005)                     Page 6 of 14                     Initials ___                     Form 3007   1/01

the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

**6. Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

**7. Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**8. Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument; (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable

attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

**(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.**

**(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.**

**11. Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.



Initials: _____

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA

requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

**21. Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.



Initials:

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

**22. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and foreclosure or sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to assert in court the non-existence of a default or any other defense of Borrower to acceleration and foreclosure or sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke any of the remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.**

**23. Release.** Upon payment and discharge of all sums secured by this Security Instrument, this Security Instrument shall become null and void and Lender shall release this Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

**24. Waivers.** Borrower waives all rights of homestead exemption in, and statutory redemption of, the Property and all right of appraisement of the Property and relinquishes all rights of curtesy and dower in the Property.

**25. Future Advances.** Lender is specifically permitted, at its option and in its discretion, to make additional loans and future advances under this Security Instrument as contemplated by Section 49-2(c) of the Connecticut General Statutes, and shall have all rights, powers and protections allowed thereunder.



BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Signed, sealed and delivered in the presence of:

_____          _____ (Seal)
PETER K. MOTTI                              ROGER BITTINGER                  -Borrower

_____          _____ (Seal)
DRU MOTT                                                                     -Borrower

_____ (Seal)   _____ (Seal)
                          -Borrower                                          -Borrower

_____ (Seal)   _____ (Seal)
                          -Borrower                                          -Borrower

_____ (Seal)   _____ (Seal)
                          -Borrower                                          -Borrower


STATE OF CONNECTICUT, NEW LONDON                          County ss:
     The foregoing instrument was acknowledged before me this SEPTEMBER 28, 2004
by ROGER BITTINGER, AN UNMARRIED MAN AND LILIAN E. BITTINGER,
AN UNMARRIED WOMAN

My Commission Expires:

_____
Notary Public
Commissioner of the Superior Court

# EXHIBIT B



State of Connecticut Judicial Branch
# Civil and Family Inquiry



**Civil / Family Home**

- **Attorney/Firm Case List**
  **Attorney/Firm Look-up** 🗗

- **Docket Number Search**
  **Party Name Search**
  **Property Address Search**

- **Short Calendars**
  **By Court Location**
  **By Juris Number**
  **Motions to Seal or Close**
  **Calendar Notices**
  **Short Calendar**
  **Quick Guide** 🗗

- **Court Events By Date**
  **Court Events By Juris Number**

- **Scheduling Inquiry**

- **Pending Foreclosure Sales** 🗗

**Questions & Answers**
**Court Information** 🗗
**Legal Terms** 🗗



**Comments**

**KNL-CV08-5008936-S**   **WELLS FARGO BANK v. BITTINGER, ROGER Et Al**

Prefix/Suffix: [none] Case Type: P00   File Date: 10/10/2008   Return Date: 10/28/2008

| Case Detail | Notices | History | Scheduled Court Dates | E-Services Login | Screen Section Help ▸ |

Pending Foreclosure Sales    To receive an email when there is activity on this case, click here. 🗗

---

**Information Updated as of: 05/12/2015**

| Case Information |
|---|
| **Case Type:** P00 - Property - Foreclosure |
| **Court Location:** NEW LONDON |
| **Property Address:** 2 Mohegan Road, Norwich, CT 06360 |
| **List Type:** REMOVED FROM TRIAL LIST (00) |
| **Trial List Claim:** |
| **Referral Judge or Magistrate:** |
| **Last Action Date:** 04/18/2014 (The "last action date" is the date the information was entered in the system) |

| Disposition Information |
|---|
| **Disposition Date:** 01/06/2014 |
| **Disposition:** JUDGMENT OF STRICT FORECLOSURE |
| **Judge or Magistrate:** HON EMMET COSGROVE |

| Party & Appearance Information |
|---|

| Party | | No Fee Party |
|---|---|---|

**P-01  WELLS FARGO BANK N.A.**
   **Attorney:** HUNT LEIBERT JACOBSON PC (101589)      File Date: 10/10/2008
   50 WESTON STREET
   HARTFORD, CT 06120
   **Attorney:** 🖉 DAVID BIZAR (417452)      File Date: 04/21/2014
   SEYFARTH SHAW LLP
   2 SEAPORT LA, SUITE 300
   BOSTON, MA 022102028

**D-50  ROGER BITTINGER**
   **Self-Rep:** 2 MOHEGAN ROAD      File Date: 10/27/2008
   NORWICH, CT 06360

**D-51  LILLIAN BITTINGER**
   Non-Appearing

**D-52  NAVY FEDERAL CREDIT UNION**
   Non-Appearing

**D-53  WILLIAM W. BACKUS HOSPITAL**
   **Attorney:** MICHALIK BAUER SILVIA & CICCARILLO LLP (423817)   File Date: 11/28/2008
   35 PEARL STREET
   SUITE 300
   NEW BRITAIN, CT 06051

**D-54  NORWICH DIAGNOSTIC IMAGING ASSOCIATES P.C.**
   **Attorney:** 🖉 MICHALIK BAUER SILVIA & CICCARILLO LLP (423817) File Date: 09/03/2009
   35 PEARL STREET
   SUITE 300
   NEW BRITAIN, CT 06051

**D-55  CAPITAL ONE BANK (USA)**
   Non-Appearing

**Viewing Documents on Civil Cases:**

- Documents, court orders and judicial notices in 2014 and future civil cases are available publicly over the internet.*
- For cases filed prior to 2014, court orders and judicial notices that are electronic are available publicly over the internet. Orders can be viewed by selecting the link to the order from the list below. Notices can be viewed by clicking the **Notices** tab above and selecting the link.*
- If there is an 🖉 in front of the docket number at the top of this page, then the file is electronic. Documents and court orders can be viewed at any judicial district courthouse and at some geographical area courthouses during normal business hours.*
- You can view pleadings or other documents that are not electronic during normal business hours at the Clerk's Office in the Judicial District where the case is located.*
- Viewing of documents protected by law or court order may be limited.

* unless otherwise restricted

| Motions / Pleadings / Documents / Case Status | | | | |
|---|---|---|---|---|
| Entry No | File Date | Filed By | Description | Arguable |
| | 10/10/2008 | P | SUMMONS | |
| | 10/10/2008 | P | COMPLAINT | |
| | 10/10/2008 | P | RETURN OF SERVICE | |
| | 10/10/2008 | P | ADDITIONAL PARTIES PAGE | |
| | 09/03/2009 | D | APPEARANCE<br>Appearance | |
| | 04/21/2014 | P | APPEARANCE<br>Appearance | |
| 101.10 | 10/10/2008 | P | FORECLOSURE MEDIATION PLAINTIFF'S COMPLIANCE WITH SERVICE (NO DOCUMENT) | No |
| 102.10 | 10/10/2008 | C | FORECLOSURE MEDIATION – ELIGIBLE CASE (NO DOCUMENT) | No |
| 103.10 | 10/27/2008 | D | FORECLOSURE MEDIATION REQUEST/CERTIFICATE JD-CV-108<br>*RESULT:* Order 10/27/2008 BY THE CLERK | No |
| 104.10 | 11/07/2008 | C | FORECLOSURE MEDIATOR'S REPORT | No |
| 105.10 | 01/27/2009 | C | FORECLOSURE MEDIATOR'S FINAL REPORT - MEDIATION PERIOD TERMINATED | No |
| 106.00 | 09/02/2009 | P | SUPPLEMENTAL RETURN | No |
| 107.00 | 09/02/2009 | P | MOTION FOR DEFAULT-FAILURE TO APPEAR<br>*RESULT:* Granted 10/16/2009 BY THE CLERK | No |
| 108.00 | 09/02/2009 | P | MOTION FOR DEFAULT-FAILURE TO PLEAD<br>*RESULT:* Granted 10/16/2009 BY THE CLERK | No |
| 109.00 | 09/02/2009 | P | DEMAND FOR DISCLOSURE OF DEFENSE | No |
| 110.00 | 09/03/2009 | D | DISCLOSURE OF NO DEFENSE | No |
| 111.00 | 10/28/2009 | P | MOTION FOR DEFAULT-FAILURE TO PLEAD<br>*RESULT:* Granted 11/3/2009 BY THE CLERK | No |
| 112.00 | 10/28/2009 | P | DEMAND FOR DISCLOSURE OF DEFENSE | No |
| 113.00 | 10/28/2009 | P | MOTION FOR JUDGMENT-STRICT FORECLOSURE | Yes |
| 114.00 | 10/28/2009 | P | APPRAISAL | No |
| 115.00 | 10/28/2009 | P | WITHDRAWAL OF MOTION | No |
| 116.00 | 10/28/2009 | P | MOTION FOR JUDGMENT-STRICT FORECLOSURE<br>*RESULT:* Granted 11/9/2009 HON JAMES DEVINE | Yes |
| 117.00 | 11/04/2009 | P | AFFIDAVIT OF COMPLIANCE WITH EMAP | No |
| 118.00 | 11/05/2009 | P | FORECLOSURE WORKSHEET JD-CV-77 | No |
| 119.00 | 11/05/2009 | P | MILITARY AFFIDAVIT | No |
| 120.00 | 11/05/2009 | P | AFFIDAVIT OF DEBT | No |
| 121.00 | 11/05/2009 | P | AFFIDAVIT<br>Atty Fees Affidavit | No |
| 122.00 | 11/09/2009 | | JUDGMENT OF STRICT FORECLOSURE | No |

|        |            |   | *RESULT:* 11/9/2009 HON JAMES DEVINE |     |
|--------|------------|---|--------------------------------------|-----|
| 123.00 | 11/17/2009 | P | NOTICE OF JUDGMENT – CERTIFIED/SERVED | No |
| 124.00 | 11/17/2009 | P | COMPLIANCE | No |
| 125.00 | 11/20/2009 | P | BILL OF COSTS | No |
| 126.00 | 12/01/2009 | D | MOTION TO OPEN JUDGMENT | No |
| 126.50 | 12/01/2009 | D | PETITION TO PARTICIPATE IN MEDIATION PROCESS BY AGGRIEVED PERSON JD-CV-96<br>*RESULT:* Granted 12/14/2009 HON JAMES DEVINE | No |
| 126.70 | 12/14/2009 | C | ORDER 📄<br>*RESULT:* Granted 12/14/2009 HON JAMES DEVINE | No |
| 127.00 | 12/22/2009 | P | NOTICE OF JUDGMENT – CERTIFIED/SERVED | No |
| 128.00 | 12/22/2009 | P | COMPLIANCE | No |
| 129.00 | 01/26/2010 | P | MOTION TO OPEN AND VACATE JUDGMENT<br>*RESULT:* Granted 2/8/2010 HON JAMES DEVINE | No |
| 129.01 | 02/08/2010 | C | ORDER 📄<br>*RESULT:* Granted 2/8/2010 HON JAMES DEVINE | No |
| 129.50 | 02/08/2010 | C | REPLACE RECORD TO PLEADING STATUS (KEYPOINT 2) AND ERASE ALL HIGHER KEYPOINT DATES | No |
| 130.00 | 02/08/2010 | C | FORECLOSURE MEDIATOR'S FINAL REPORT - MEDIATION PERIOD TERMINATED | No |
| 131.00 | 02/16/2010 | P | COMPLIANCE<br>Compliance w/court ordered notice of judgment | No |
| 132.00 | 03/17/2010 | P | NOTICE OF BANKRUPTCY | No |
| 133.00 | 07/19/2010 | P | NOTICE OF BANKRUPTCY<br>NOTICE OF BANKRUPTCY CLOSURE | No |
| 134.00 | 12/21/2010 | D | PETITION TO PARTICIPATE IN MEDIATION PROCESS BY AGGRIEVED PERSON JD-CV-96<br>*RESULT:* Granted 1/3/2011 HON JAMES DEVINE | No |
| 134.50 | 01/03/2011 | C | ORDER 📄<br>*RESULT:* Granted 1/3/2011 HON JAMES DEVINE | No |
| 135.10 | 01/18/2011 | C | FORECLOSURE MEDIATOR'S REPORT | No |
| 136.00 | 02/28/2011 | P | MOTION FOR CONTINUANCE<br>*RESULT:* Granted 2/28/2011 HON JAMES DEVINE | No |
| 136.20 | 02/28/2011 | C | ORDER 📄<br>New mediation date: 4/15/11<br>*RESULT:* Granted 2/28/2011 HON JAMES DEVINE | No |
| 137.00 | 02/28/2011 | P | FORECLOSURE MEDIATION - MOTION FOR MODIFICATION OF MEDIATION PERIODJD-CV-96<br>*RESULT:* Granted 2/28/2011 HON JAMES DEVINE | No |
| 137.20 | 02/28/2011 | C | ORDER 📄<br>Mediation period extended through 4/15/11<br>*RESULT:* Granted 2/28/2011 HON JAMES DEVINE | No |
| 138.00 | 04/15/2011 | D | FORECLOSURE MEDIATION - MOTION FOR MODIFICATION OF MEDIATION PERIODJD-CV-96<br>*RESULT:* Granted 4/18/2011 HON JAMES DEVINE | No |
| 138.20 | 04/18/2011 | C | ORDER 📄<br>Mediation period extended through 5/30/11<br>*RESULT:* Granted 4/18/2011 HON JAMES DEVINE | No |
| 139.00 | 05/19/2011 | D | FORECLOSURE MEDIATION - MOTION FOR MODIFICATION OF MEDIATION PERIODJD-CV-96<br>*RESULT:* Granted 5/19/2011 HON JAMES DEVINE | No |
| 139.20 | 05/19/2011 | C | ORDER 📄<br>Mediation period extended through 6/30/11<br>*RESULT:* Granted 5/19/2011 HON JAMES DEVINE | No |
| 140.00 | 06/29/2011 | D | FORECLOSURE MEDIATION - MOTION FOR MODIFICATION OF MEDIATION PERIODJD-CV-96<br>*RESULT:* Granted 6/29/2011 HON JAMES DEVINE | No |
| 140.20 | 06/29/2011 | C | ORDER 📄 | No |

|  |  |  |  |  |
|---|---|---|---|---|
|  |  |  | Mediation period extended through 8/15/11 | |
|  |  |  | *RESULT:* Granted 6/29/2011 HON JAMES DEVINE | |
| 141.00 | 08/11/2011 | D | **FORECLOSURE MEDIATION - MOTION FOR MODIFICATION OF MEDIATION PERIODJD-CV-96** | No |
|  |  |  | *RESULT:* Granted 8/12/2011 HON JAMES DEVINE | |
| 141.20 | 08/12/2011 | C | **ORDER** 🗐 | No |
|  |  |  | Mediation period extended through 9/30/11 | |
|  |  |  | *RESULT:* Granted 8/12/2011 HON JAMES DEVINE | |
| 142.00 | 09/20/2011 | D | **FORECLOSURE MEDIATION - MOTION FOR MODIFICATION OF MEDIATION PERIODJD-CV-96** | No |
|  |  |  | *RESULT:* Granted 9/20/2011 HON JAMES DEVINE | |
| 142.20 | 09/20/2011 | C | **ORDER** 🗐 | No |
|  |  |  | *RESULT:* Granted 9/20/2011 HON JAMES DEVINE | |
| 143.00 | 10/25/2011 | D | **FORECLOSURE MEDIATION - MOTION FOR MODIFICATION OF MEDIATION PERIODJD-CV-96** | No |
|  |  |  | *RESULT:* Granted 10/26/2011 HON JAMES DEVINE | |
| 143.20 | 10/26/2011 | C | **ORDER** 🗐 | No |
|  |  |  | Mediation period extended through12/10/11 | |
|  |  |  | *RESULT:* Granted 10/26/2011 HON JAMES DEVINE | |
| 144.00 | 12/07/2011 | D | **FORECLOSURE MEDIATION - MOTION FOR MODIFICATION OF MEDIATION PERIODJD-CV-96** | No |
|  |  |  | *RESULT:* Granted 12/7/2011 HON JAMES DEVINE | |
| 144.20 | 12/07/2011 | C | **ORDER** 🗐 | No |
|  |  |  | *RESULT:* Granted 12/7/2011 HON JAMES DEVINE | |
| 145.00 | 01/19/2012 | D | **FORECLOSURE MEDIATION - MOTION FOR MODIFICATION OF MEDIATION PERIODJD-CV-96** | No |
|  |  |  | *RESULT:* Granted 1/19/2012 HON JAMES DEVINE | |
| 145.20 | 01/19/2012 | C | **ORDER** 🗐 | No |
|  |  |  | Mediation period extended through 3/10/12 | |
|  |  |  | *RESULT:* Granted 1/19/2012 HON JAMES DEVINE | |
| 146.00 | 03/01/2012 | D | **FORECLOSURE MEDIATION - MOTION FOR MODIFICATION OF MEDIATION PERIODJD-CV-96** | No |
|  |  |  | *RESULT:* Granted 3/1/2012 HON JAMES DEVINE | |
| 146.20 | 03/01/2012 | C | **ORDER** 🗐 | No |
|  |  |  | Mediation period extended through 4/20/12 | |
|  |  |  | *RESULT:* Granted 3/1/2012 HON JAMES DEVINE | |
| 147.00 | 03/29/2012 | D | **FORECLOSURE MEDIATION - MOTION FOR MODIFICATION OF MEDIATION PERIODJD-CV-96** | No |
|  |  |  | *RESULT:* Granted 3/28/2012 HON JAMES DEVINE | |
| 147.20 | 03/29/2012 | C | **ORDER** 🗐 | No |
|  |  |  | Mediation period extended through 5/30/12 | |
|  |  |  | *RESULT:* Granted 3/28/2012 HON JAMES DEVINE | |
| 148.00 | 05/24/2012 | D | **FORECLOSURE MEDIATION - MOTION FOR MODIFICATION OF MEDIATION PERIODJD-CV-96** | No |
|  |  |  | *RESULT:* Granted 5/24/2012 HON JAMES DEVINE | |
| 148.20 | 05/24/2012 | C | **ORDER** 🗐 | No |
|  |  |  | Mediation period extended through 7/15/12 | |
|  |  |  | *RESULT:* Granted 5/24/2012 HON JAMES DEVINE | |
| 149.00 | 07/18/2012 | D | **FORECLOSURE MEDIATION - MOTION FOR MODIFICATION OF MEDIATION PERIODJD-CV-96** | No |
|  |  |  | *RESULT:* Granted 7/18/2012 HON JAMES DEVINE | |
| 149.20 | 07/18/2012 | C | **ORDER** 🗐 | No |
|  |  |  | Mediation extended to 8/31/12 | |
|  |  |  | *RESULT:* Granted 7/18/2012 HON JAMES DEVINE | |
| 150.00 | 08/23/2012 | D | **FORECLOSURE MEDIATION - MOTION FOR MODIFICATION OF MEDIATION PERIODJD-CV-96** | No |
|  |  |  | *RESULT:* Granted 8/23/2012 HON JAMES DEVINE | |
| 150.20 | 08/23/2012 | C | **ORDER** 🗐 | No |
|  |  |  | Mediation period extended through 10/15/12 | |
|  |  |  | *RESULT:* Granted 8/23/2012 HON JAMES DEVINE | |
| 151.00 | 10/12/2012 | D | **FORECLOSURE MEDIATION - MOTION FOR MODIFICATION OF MEDIATION PERIODJD-CV-96** | No |

|  |  |  |  |  |
|---|---|---|---|---|
|  |  |  | *RESULT:* Granted 10/12/2012 HON EMMET COSGROVE |  |
| 151.20 | 10/12/2012 | C | **ORDER** 📝 <br> Mediation extended to 11/30/12 <br> *RESULT:* Granted 10/12/2012 HON EMMET COSGROVE | No |
| 152.10 | 11/14/2012 | D | **FORECLOSURE MEDIATION - MOTION FOR MODIFICATION OF MEDIATION PERIODJD-CV-96** <br> *RESULT:* Granted 11/14/2012 HON EMMET COSGROVE | No |
| 152.20 | 11/14/2012 | C | **ORDER** 📝 <br> Mediation period extended through 12/31/12 <br> *RESULT:* Granted 11/14/2012 HON EMMET COSGROVE | No |
| 153.00 | 12/18/2012 | P | **MOTION FOR CONTINUANCE** <br> *RESULT:* Granted 12/18/2012 HON EMMET COSGROVE | No |
| 153.20 | 12/18/2012 | C | **ORDER** 📝 <br> *RESULT:* Granted 12/18/2012 HON EMMET COSGROVE | No |
| 154.00 | 12/18/2012 | P | **FORECLOSURE MEDIATION - MOTION FOR MODIFICATION OF MEDIATION PERIODJD-CV-96** <br> *RESULT:* Granted 12/18/2012 HON EMMET COSGROVE | No |
| 154.20 | 12/18/2012 | C | **ORDER** 📝 <br> Mediation extended to 2/8/13 <br> *RESULT:* Granted 12/18/2012 HON EMMET COSGROVE | No |
| 155.00 | 01/25/2013 | D | **MOTION FOR CONTINUANCE** <br> *RESULT:* Granted 1/25/2013 HON EMMET COSGROVE | No |
| 155.20 | 01/25/2013 | C | **ORDER** 📝 <br> *RESULT:* Granted 1/25/2013 HON EMMET COSGROVE | No |
| 156.00 | 01/25/2013 | D | **FORECLOSURE MEDIATION - MOTION FOR MODIFICATION OF MEDIATION PERIODJD-CV-96** <br> *RESULT:* Granted 1/25/2013 HON EMMET COSGROVE | No |
| 156.20 | 01/25/2013 | C | **ORDER** 📝 <br> Mediation extended to 3/22/13 <br> *RESULT:* Granted 1/25/2013 HON EMMET COSGROVE | No |
| 157.00 | 03/21/2013 | P | **MOTION FOR CONTINUANCE** <br> *RESULT:* Granted 3/22/2013 HON EMMET COSGROVE | No |
| 157.20 | 03/22/2013 | C | **ORDER** 📝 <br> *RESULT:* Granted 3/22/2013 HON EMMET COSGROVE | No |
| 158.00 | 03/22/2013 | P | **FORECLOSURE MEDIATION - MOTION FOR MODIFICATION OF MEDIATION PERIODJD-CV-96** <br> *RESULT:* Granted 3/22/2013 HON EMMET COSGROVE | No |
| 158.20 | 03/22/2013 | C | **ORDER** 📝 <br> Mediation extended to 5/1/13 <br> *RESULT:* Granted 3/22/2013 HON EMMET COSGROVE | No |
| 159.00 | 04/26/2013 | P | **MOTION FOR CONTINUANCE** <br> *RESULT:* Granted 4/26/2013 HON EMMET COSGROVE | No |
| 159.20 | 04/26/2013 | C | **ORDER** 📝 <br> *RESULT:* Granted 4/26/2013 HON EMMET COSGROVE | No |
| 160.00 | 04/26/2013 | P | **FORECLOSURE MEDIATION - MOTION FOR MODIFICATION OF MEDIATION PERIODJD-CV-96** <br> *RESULT:* Granted 4/26/2013 HON EMMET COSGROVE | No |
| 160.20 | 04/26/2013 | C | **ORDER** 📝 <br> Mediation extended to 6/1/13 <br> *RESULT:* Granted 4/26/2013 HON EMMET COSGROVE | No |
| 161.00 | 05/28/2013 | D | **FORECLOSURE MEDIATION - MOTION FOR MODIFICATION OF MEDIATION PERIODJD-CV-96** <br> *RESULT:* Granted 5/28/2013 HON EMMET COSGROVE | No |
| 161.20 | 05/28/2013 | C | **ORDER** 📝 <br> Mediation extended to 7/10/13 <br> *RESULT:* Granted 5/28/2013 HON EMMET COSGROVE | No |
| 162.00 | 07/08/2013 | D | **FORECLOSURE MEDIATION - MOTION FOR MODIFICATION OF MEDIATION PERIODJD-CV-96** <br> *RESULT:* Granted 7/15/2013 HON EMMET COSGROVE | No |
| 162.20 | 07/15/2013 | C | **ORDER** 📝 | No |

Mediation extended to 8/10/13
*RESULT:* Granted 7/15/2013 HON EMMET COSGROVE

| | | | | |
|---|---|---|---|---|
| 163.00 | 08/09/2013 | C | **FORECLOSURE MEDIATOR'S REPORT** | No |
| 164.00 | 08/09/2013 | C | **FORECLOSURE MEDIATOR'S FINAL REPORT - MEDIATION PERIOD TERMINATED** | No |
| 165.00 | 11/22/2013 | P | **AFFIDAVIT FEDERAL LOSS MITIGATION PROGRAMS (JD-CL-114)** | No |
| 166.00 | 12/02/2013 | P | **AFFIDAVIT FEDERAL LOSS MITIGATION PROGRAMS (JD-CL-114)** | No |
| 167.00 | 12/20/2013 | P | **MILITARY AFFIDAVIT** | No |
| 168.00 | 12/23/2013 | P | **APPRAISAL** | No |
| 169.00 | 12/23/2013 | P | **MOTION FOR JUDGMENT-STRICT FORECLOSURE** | Yes |
| | | | *RESULT:* Granted 1/6/2014 HON EMMET COSGROVE | |
| 169.50 | 01/06/2014 | C | **ORDER** 📝 | No |
| | | | *RESULT:* Granted 1/6/2014 HON EMMET COSGROVE | |
| 170.00 | 12/31/2013 | P | **AFFIDAVIT OF COMPLIANCE WITH EMAP** | No |
| 171.00 | 12/31/2013 | P | **FORECLOSURE WORKSHEET JD-CV-77** | No |
| 172.00 | 12/31/2013 | P | **MILITARY AFFIDAVIT** | No |
| 173.00 | 12/31/2013 | P | **AFFIDAVIT OF DEBT** | No |
| 174.00 | 12/31/2013 | P | **AFFIDAVIT RE: ATTORNEY/COUNSEL FEES** | No |
| 175.00 | 01/03/2014 | P | **MILITARY AFFIDAVIT** | No |
| 176.00 | 01/06/2014 | C | **JUDGMENT OF STRICT FORECLOSURE** | No |
| | | | *RESULT:* HON EMMET COSGROVE | |
| 177.00 | 01/15/2014 | P | **NOTICE OF JUDGMENT – CERTIFIED/SERVED** | No |
| 178.00 | 03/24/2014 | D | **MOTION TO OPEN JUDGMENT** | No |
| | | | *RESULT:* Granted 3/31/2014 HON EMMET COSGROVE | |
| 178.50 | 03/31/2014 | C | **ORDER** 📝 | No |
| | | | *RESULT:* Granted 3/31/2014 HON EMMET COSGROVE | |
| 179.00 | 04/10/2014 | P | **NOTICE OF JUDGMENT – CERTIFIED/SERVED** | No |
| | | | 9171969009350057991662 | |

| Scheduled Court Dates as of 05/11/2015 | | | | |
|---|---|---|---|---|
| **KNL-CV08-5008936-S - WELLS FARGO BANK v. BITTINGER, ROGER Et Al** | | | | |
| **#** | **Date** | **Time** | **Event Description** | **Status** |
| | | | No Events Scheduled | |

Judicial ADR events may be heard in a court that is different from the court where the case is filed. To check location information about an ADR event, select the **Notices** tab on the top of the case detail page.

Short Calendar and family support magistrate calendar matters are shown as scheduled court dates. If there are multiple motions on a single short calendar, the calendar will be listed once. You can see more information on matters appearing on short calendars and family support magistrate calendars by going to the Civil/Family Case Look-Up page and Short Calendars By Juris Number or By Court Location.

Periodic changes to terminology that do not affect the status of the case may be made.

This list does not constitute or replace official notice of scheduled court events.

**Disclaimer:** For civil and family cases statewide, case information can be seen on this website for a period of time, from one year to a maximum period of ten years, after the disposition date. If the Connecticut Practice Book Sections 7-10 and 7-11 give a shorter period of time, the case information will be displayed for the shorter period. Under the Federal Violence Against Women Act of 2005, cases for relief from physical abuse, foreign protective orders, and motions that would be likely to publicly reveal the identity or location of a protected party may not be displayed and may be available only at the courts.

Attorneys | Case Look-up | Courts | Directories | EducationalResources | E-Services | FAQ's | Juror Information | News & Updates | Opinions | Opportunities | Self-Help | Home

Common Legal Terms | Contact Us | Site Map | Website Policies

Copyright © 2015, State of Connecticut Judicial Branch

Page Created on 5/12/2015 at 1:34:55 PM

***REDLINE VERSION OF AMENDED PLEADING***

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| ROGER BITTINGER and | : | |
| LILIAN BITTINGER, | : | |
| | : | Civil Action No. 14-1255 |
| Plaintiffs | : | |
| | : | |
| | : | Connecticut Superior Court, |
| v. | : | Judicial District of New London |
| | : | KNL-CV14-4012480S |
| WELLS FARGO, N.A. and NATIONAL | : | |
| FIELD REPRESENTATIVES, INC. | : | |
| | : | |
| Defendant | : | SEPTEMBER 19, 2017 |

## PLAINTIFFS' ~~SECOND~~ FOURTH AMENDED COMPLAINT AND JURY DEMAND

## I. PRELIMINARY STATEMENT

This matter was commenced in Connecticut Superior Court as a wrongful entry and detainer action pursuant to Connecticut General Statutes §47a-43. The Defendant, Wells Fargo Bank, N.A. filed a Notice of Removal pursuant to 28 U.S. C. §§ 1331 [federal question], 1332 [diversity of citizenship and amount in controversy], 1367 [supplemental jurisdiction], 1441 and 1446 [removal]. On March 23, 2015, the Defendant Wells Fargo Bank, N.A., (hereinafter "Wells Fargo") filed a Motion to Dismiss the Plaintiffs' Amended Complaint in its entirety. [Doc. 30] On April 30, 2015, the Defendant National Field Representatives, Inc. (hereinafter "NFR"), filed its own Motion to Dismiss, directed at the Tenth, Thirteenth, Fourteenth, Fifteenth, Seventeenth and Eighteenth Counts, of the Amended Complaint. [Doc. 40] The Court held a hearing on the Defendants' motions on August 24, 2015, ruling from the bench that the counts directed against Wells Fargo be dismissed *en toto* and with prejudice as to all counts except with respect to the negligence count. The court also ruled in favor of NFR's Motion to Dismiss, leaving those counts not included in NFR's motion remaining against NFR. On or about September 24, 2015, Plaintiffs

1

filed their Second Amended Complaint, raising claims of breach of contract, negligence, and negligent hiring, training, and/ or supervision against Wells Fargo, and repeating claims of conversion, statutory theft, and negligence against NFR. [Doc. 48]. Both Defendants filed Motions to Dismiss all counts of the Second Amended Complaint pled against them. [Doc. 57 and Doc. 66]. On or about July 21, 2016, the Court entered its Order dismissing the counts asserting breach of contract and ordinary negligence against Wells Fargo, and denying NFR's motion to dismiss. [Doc. 75]. On or about October 21, 2015, Plaintiffs filed its Third Amended Complaint [Doc. 53] and Motion for Joinder of Defendant, Home Team Property Services, LLC (("Home Team") [Doc. 52]. On or about November 23, 2015, the Court denied Plaintiff's Motion for Joinder and struck Plaintiff's Third Amended Complaint [Doc. 53], ruling that Home Team was not a necessary party and the Second Amended Complaint [Doc. 48] would remain the operative Complaint. [Doc. 64] On March 2, 2016, Plaintiffs commenced a separate action against Home Team in Connecticut Superior. Thereafter,As a result of a recent filing by Home Team in the State Court action. Plaintiffs discovered that their operative Complaint, which alleges that Defendants failed to adhere to the applicable Mortgage Servicer Guide, alleged that the incorrect guide was applicable to the Plaintiffs' Mortgage.[1] Plaintiffs hereby submit this Fourth Amended Complaint to ensure that the appropriate Mortgage Servicing Guide, and the relevant provisions, are referenced in its Complaint.

This Fourth Amended Complaint also removes the text of the breach of contract claim and ordinary negligence claim pursuant to the Court's Order [Doc 75], which were successfully dismissed by Defendant, Wells Fargo, from Plaintiffs' Second Amended Complaint

---

[1] Plaintiff's operative Complaint alleges that the Freddie Mac Single Family/ Single-Seller Servicer Guide was applicable to Plaintiffs' Mortgage, however, it is the U.S. Department of Veteran's Affairs VA Servicer Guide that is applicable.

~~The Plaintiffs hereby submit this Second~~ <u>Fourth</u> Amended Complaint pursuant to the Court's order, revising and adding counts against NFR and Wells Fargo as stated below.

## II. JURISDICTION AND VENUE

~~In addition to jurisdictional claims made in the Defendant's Notice of Removal, a~~<u>A</u>s a result of the original removal of this action to this court, and upon this court's ruling on the defendants' motion to dismiss the action, <u>Jurisdiction in this matter is based on diversity of citizenship pursuant to 28 U.S.C. § 1332.</u>~~the Plaintiffs, Roger Bittinger and Lilian Bittinger, hereby amend their complaint to include, in particular, that Wells Fargo Bank, N.A. acting independently and in concert with its agent and/or contractor, National Field Representatives, Inc., have committed acts under the theories of negligence, breach of contract, negligent hiring and/or supervision and that such acts have harmed the plaintiffs. The plaintiffs further revise their remaining counts against NFR as stated herein.~~

Venue is proper in this district under 29 U.S.C. § 1391(b) because the acts giving rise to this action occurred in substantial part in this district.

## III. PARTIES

1.      The Plaintiffs, Roger Bittinger and Lilian Bittinger, (hereinafter referred to as the "Bittingers" and alternatively the "Plaintiffs") are individual consumers over the age of eighteen (18) years and have at all times relevant resided in this district.

2.      The Defendant, Wells Fargo states in its removal papers that it is a National Association federally chartered with the Office of the Comptroller of Currency of the United States Department of the Treasury and a citizen of South Dakota, maintaining its main office in Sioux Falls, South Dakota.

3.     National Field Representatives, Inc. (hereinafter "NFR") is a New Hampshire Corporation, that at all times relevant hereto, was doing business as itself and through its agent(s) in New London County, Connecticut.

## IV.  FACTS RELEVANT TO ALL COUNTS

4.     At all relevant times the Plaintiffs, Bittingers were the owners of a certain single family residence located at 2 Mohegan Road, Norwich, Connecticut (the "Premises").

5.     On or about October 10, 2008, Wells Fargo filed a Writ and Summons in the Connecticut Superior Court, Judicial District of New London at New London sounding in foreclosure against the Bittingers, bearing a return date of October 28, 2008 and having been assigned a docket number of CV08-5008936S[2] (the "foreclosure").

6.     The foreclosure was an action to foreclose Wells Fargo's "Open-End Mortgage Deed" ("Mortgage") that Wells Fargo held on the Bittingers' home, which they owned, located at 2 Mohegan Road, Norwich, Connecticut (the "Premises").

7.     Wells Fargo was required to follow Connecticut statutory and civil procedure in foreclosing the Mortgage against the Bittingers' interest in their home.

8.     A copy of said Mortgage is attached here to Exhibit A.

9.     The Mortgage form (Exhibit A) is the Connecticut Single Family-Fannie Mae/Freddie Mac uniform form.

~~9.~~10.   The Mortgage created a legal relationship between the Bittingers and Wells Fargo, wherein the Bittingers were "Borrowers" and Wells Fargo the "Lender" under its' terms.

~~10.~~11.  Wells Fargo was the servicer under this Mortgage which secured the corresponding Note referenced in the Mortgage.

---

[2] Lilian Bittinger is referred to as Lillian Bittinger in the foreclosure.

11. 12. As the loan secured by the Mortgage was a VA loan, Wells Fargo, including its agents and employees, were~~is~~ subject to, and required to follow the ~~Freddie Mac Single Family/Single Seller/~~U.S. Department of Veterans Affairs VA Servicer Guide ("Guide"), which provides, inter alia, guidelines and regulations pertaining to the servicing of qualifying mortgages, such as the Bittingers' Mortgage in this matter.

13. The Guide is a reference tool used by servicers, such as Wells Fargo, to set out, among other things, the protocol to follow in servicing ~~consumer~~ VA loans. It is designed to afford protection not just to the servicer (Wells Fargo) but also to the ~~consumers~~ borrowers (the Bittingers).

14. In addition to the Guide, the Department of Veterans Affairs issues "circulars" to provide national guidance and describe the minimum requirements for the inspection of properties securing VA-guaranteed home loans and the maintenance, preservation, and repair of any properties found to be abandoned.

15. VA Circular 26-09-12 was the applicable servicing guide for property preservation services on the Plaintiffs' Mortgage.

12. 16. Annex 12 of the Guide sets forth the VA Property Preservation Requirements, and its provisions are virtually the same as those set forth in VA Circular 26-09-12.

13. 17. Wells Fargo is aware of the Guide and that it is required to follow its instructions pertaining to servicing consumer mortgages.

18. The Guide contains several provisions and protocols for servicers to follow when certain circumstances surrounding the mortgaged property arise, including but not limited to the suspected abandonment of mortgaged property, and how to proceed upon the suspicion of the same.

19.     The Guide contains a glossary of terms, and defines "abandonment" as follows: "The release of a claim or right to a property with the intention of terminating ownership and without giving it to anyone else."

20.     The Guide also provides that a property is "abandoned" where "[it] is vacant, is not being maintained, and is not offered for sale or rent, and there has been no contact with the current owner." It likewise provides that a property is "vacant" where the "Property is not being occupied by anyone but appears to be maintained and is secure.

21.     The Guide sets forth a process for the servicing of delinquent VA loans. In the event of a delinquency, Section 4.2.1 of the Guide requires the servicer to contact the borrower to establish the borrower's intent with regards to the property.

22.     VA Circular 26-09-12 and the Guide provide that, if the servicer receives advice that a property is vacant and unsecured, it shall make "appropriate arrangements to protect the property" from unnecessary deterioration due to vandalism or the elements due to neglect. It requires that an inspection be immediately scheduled and completed to document the condition of the property, in order to verify if the occupants have abandoned the property.

23.     In making the determination as to whether the property is vacant or abandoned, VA Circular 26-09-12 provides that "[a]ll circumstances should be considered." As an example, it indicates that the absence of personal property may indicate that the property has been abandoned.

24.     If the servicer determines the property to be vacant and abandoned, the Guide directs the servicer to protect and preserve such property. It also mandates that the servicer comply with various reporting requirements.

14. The Mortgage created a legal relationship between the Bittingers and Wells Fargo, wherein the Bittingers were "Borrowers" and Wells Fargo the "Lender" under its' terms.

15. By virtue of this relationship, it also subjected Wells Fargo to follow certain provisions provided for in the Guide.

16.25. The Mortgage contains the several provisions that the Bittinger's, as the "Borrowers" and Wells Fargo, as the "Lender", must adhere to.

17.26. Among other terms and conditions found in the Mortgage, the Mortgage also contains the following provisions:

    a. [Section 7, in relevant part (emphasis added)]: Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender *shall give Borrower notice at the time of or prior* to such an interior inspection *specifying such reasonable cause.*

    b. [Section 9 (emphasis added)]: **Protection of Lender's Interest in the Property and Rights Under this Security Instrument**. If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument; (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (Such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is *reasonable or appropriate* to protect Lender's interest in the Property and rights under this Security Instrument , including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9

~~18.~~27. Wells Fargo and the plaintiffs were both subject to the terms of the Mortgage upon the date of execution.

~~19. Under Section 67.28 of the Guide, "Servicing mortgages on abandoned properties", a property is not abandoned unless the owner has "voluntarily and intentionally relinquished possession, claim and control, or real property defined as abandoned property by applicable laws."~~

~~20. Section 67.28 further states that Wells Fargo, as servicer, "*must* first determine if the Borrower has, in fact, abandoned the property and *then take* the following actions," of which include, *inter alia*:~~

> ~~a. To "[a]ttempt to locate the Borrower and determine the reason for abandonment."~~
>
> ~~b. "Protect the property from waste, damage and vandalism…"~~
>
> ~~c. "Maintain accurate reports of […] conditions, detailing actions *to prevent loss*."~~

~~21. The Guide explicitly states that the servicer must make an attempt to locate the Borrowers to attempt to determine the reason for the suspected abandonment, and it is implicit in the Guide that these actions are to be done in a reasonable manner.~~

~~22.~~28. Further, in the State of Connecticut, our Supreme Court has stated that a "mortgage is regarded as mere security" for the note. See *Town of Groton v. Mardie Lane Homes, LLC,* 286 Conn. 280, 290, 943 A.2d 449 (2008). Therefore, a home owner's rights to title and possession take priority as the superior title holder to a mortgagee, and any contractual term in derogation of those rights, would be in violation of Connecticut law.

~~23.~~29. The Mortgage applied only to the real property its improvements and was not additionally secured by the Bittingers' personal property.

24.30. Throughout much of the foreclosure action the Bittingers resided in the house on the Premises, and at all times kept their valuables and personal property in the house, and areas or buildings appurtenant thereto.

25.31. Roger Bittinger appeared in the foreclosure.

26.32. Throughout the foreclosure process, the Bittingers were desirous to maintain and save their home from the foreclosure.

27.33. To that end, they engaged in the court-ordered and statutorily required foreclosure mediation process with Wells Fargo.

28.34. The Bittingers engaged in this process with Well Fargo for a period of over thirty (30) months (2 ½ years).

29.35. Wells Fargo was also an active participant in the mediation process, consenting to a multitude of extensions to the mediation period and filing its own motions for such extensions of the mediation sessions with the Bittingers.

30.36. Throughout the mediation process, Wells Fargo learned that the Bittingers were both disabled people that had fallen behind on their mortgage payments, due in part, to their disability.

31.37. Wells Fargo also learned that Mr. Bittinger was a two time Veteran of foreign war, and suffered from Post-Traumatic Stress Disorder (PTSD) from his service to our country.

32.38. Wells Fargo continued its participation in the mediation process and did not object to it taking place. A copy of the state court docketing sheet of the Bittinger's foreclosure action is attached hereto as Exhibit B.

33.39. On numerous occasions, through many mediation sessions, with the court-appointed mediator, the Bittingers informed Wells Fargo of their desire to stay in their home and save it from foreclosure.

34.40. In fact, Wells Fargo and the Bittingers worked together to attempt to save the Bittingers' home from foreclosure and work out an arrangement to permit the plaintiffs to remain in their home.

35.41. Between the parties' cooperation, the plaintiffs and Wells Fargo moved for extensions and modifications of the mediation period at least *twenty-seven* (27) times. See Exhibit B.

36.42. Upon information and belief, Wells Fargo, had the Bittingers' telephone number and email address and was able to communicate with the Bittingers without issue.

37.43. In fact, the Bittingers regularly spoke with representatives and employees of Wells Fargo to inform them of their progress in the mediation session and, as the mediation session failed, the status of their possession of the property.

38.44. Upon information and belief, there were no known impediments between Wells Fargo and the Bittingers communicating with one another, and in fact, they communicated regularly throughout the foreclosure and mediation process.

39.45. Upon information and belief, the plaintiffs were not difficult to get ahold of, absent from mediation sessions or tardy in their obligations to turn documents over to Wells Fargo as the foreclosure process continued.

40.46. The Bittingers stated to Wells Fargo that their belongings remained in their home, even though they were seeking a new residence as the foreclosure progressed.

~~41.~~47. The Bittingers never stated to Wells Fargo their intent to abandon their home or acknowledged that they had in fact abandoned their home and their belongings therein.

~~42.~~48. After years of trying, the mediation attempt was ultimately not successful between the plaintiffs and Wells Fargo, resulting in the entry of judgment of strict foreclosure per order of the Court (Cosgrove, J.) on January 6, 2014.

~~43.~~49. By order of the court in the foreclosure (J. Cosgrove), the court gave the Bittingers, as owners of the equity of redemption, until April 1, 2014 to exercise their rights of redemption in the Premises.

~~44.~~50. The Bittingers maintained equitable title at all times prior to their law day passing.

~~45.~~51. In addition to enjoying the equitable title to their home, the Bittingers maintained actual, peaceable possession of the Premises throughout all times relevant hereto.

~~46.    Upon information and belief, after the entry of judgment, the Bittingers also communicated with Wells Fargo that they had not abandoned their home and that their belongings still remained within the property.~~

~~47.~~52. Understanding that they were not likely going to be able to raise the funds necessary to reinstate their Mortgage with Wells Fargo, or sell their home to generate enough proceeds to pay off the Mortgage, the Bittingers began to search for suitable replacement housing.

~~48.~~53. The plaintiffs communicated to Wells Fargo that they were seeking new housing as the law date for the foreclosure was approaching.

54.    During this period of time, they kept their belongings in their home and checked on them frequently, as well as taking all reasonable steps to protect their home during this process.

~~49.~~55. In about February 2014, Wells Fargo, or an entity acting on its behalf, posted a notice on the Property indicating that the servicer, or its agent, believed the premises to be

11

abandoned or vacant, and stating that the property would be secured thereafter if the borrowers did not contact Wells Fargo to indicate otherwise.  Thereafter, but prior to March 1, 2014, the Bittingers communicated with Wells Fargo that they had not abandoned their home and that their belongings still remained within the property.

~~50.~~56.  On or about March 15, 2014, during one of the plaintiffs' routine inspections of their home and their belongings, the Bittingers' came upon their home and found the locks to be changed.

~~51.~~57.  The plaintiffs also found evidence that forcible entry had been committed upon their home.

~~52.~~58.  The plaintiffs were blocked and locked out from entering their home.

~~53.~~59.  Wells Fargo, failed to take reasonable steps to inform the plaintiffs that they were undertaking steps to take control of the plaintiffs' home.

~~54.~~60.  In fact, upon information and belief, the only step that the plaintiffs understand Wells Fargo, through its own actions or that of their agent or contractor, took was placing a notice sticker on the premises.

~~55.~~61.  Said notice sticker is wholly inadequate for reasonable notice under these circumstances, due to (but not limited to) the following facts:

   a.  The entire premise of Wells Fargo's right to enter the plaintiffs' home is the fact that it suspected the Premises was abandoned.  Therefore, it is unreasonable to have the only way Wells Fargo attempts to notify the plaintiffs of its intent to secure the premises, be the placing of a sticker on the very house they believed to be abandoned.

b. Moreover, Wells Fargo and these plaintiffs were involved in years of litigation and mediation sessions with one another. Communication was commonplace and undeterred. Wells Fargo had the plaintiffs' contact information (phone numbers and email addresses) and regularly communicated about the status of the foreclosure and the plaintiffs' continued possession of their home.

56.62. In addition to this, after Plaintiffs indicated to Wells Fargo that they had not abandoned the home, Wells Fargo never informed the plaintiffs or put them on notice that Wells Fargo believed it had reasonable cause to inspect the interior of the plaintiffs' home prior to their or their agents or contractors entry upon the interior of their home.

57.63. Wells Fargo further failed to notify or reasonably attempt to notify the plaintiffs of the basis for its alleged reasonable cause to enter the plaintiffs' home.

58.64. Wells Fargo employed or hired, either as its agent or as an independent contractor, NFR to effectuate the locking out of the Bittinger's from their home.

59.65. Wells Fargo has used NFR for this purpose before, on multiple occasions, in multiple locations within multiple states.

60.66. Wells Fargo also routinely hires companies like NFR to perform the same type of service for them.

61.67. Upon information and belief, Wells Fargo then directly instructed NFR, to secure the Bittingers' home, by doing one or more of the following acts:

a. Notifying NFR that Wells Fargo believed that the plaintiffs' home was abandoned;

b. Then based upon this belief, communicating to NFR that Wells Fargo desired it to go out and secure the Bittingers' home;

c.  Discussing and setting with NFR a time-table by which this act was  to be conducted;

d.  Instructing NFR to place a notice on the Bittingers' door regarding the notice of the abandonment and lock out;

e.  Indicating to NFR that Wells Fargo believed it had the authority to authorize NFR to lock the Bittinger's out of their home based upon the rights conferred to Wells Fargo only (and not to NFR), in the Mortgage;

f.  Reviewing and becoming aware of NFR's procedures to conduct this type of act to ensure it is done in accordance to a level of protocol acceptable to Wells Fargo, and;

g.  Compensating NFR for the completion of the acts NFR committed upon the plaintiffs' property.

~~62.~~68.  NFR accepted its role and direction from Wells Fargo and acted pursuant to that understanding, including understanding that Wells Fargo ultimately controlled the actions pertaining to their actions to lock out the plaintiffs from their home.

~~63.~~69.  NFR acted upon this role as Wells Fargo's agent and/or contractor.

~~64.~~70.  Pursuant to this, NFR then, through its own actions or through the actions of its agent and/or contractor, took steps to break into the plaintiffs' home and lock the plaintiffs out of it.

~~65.~~71.  Wells Fargo benefitted by the actions of NFR or its agents and/or contractors by NFR's acts to secure the Premises Wells Fargo believed abandoned, thereby, in Wells Fargo's estimation, protecting their interest in the Premises.

14

66.72. This was despite the fact that Wells Fargo knew or should have known that the plaintiffs were no longer in their home on a daily basis by virtue of the fact that the foreclosure process was under way, and they were in the process of moving their belongings to their new home.

67.73. Upon information and belief, NFR believed it had the authority to enter the plaintiffs' home based upon the representations of said right and authority given to it by Wells Fargo.

68.74. Upon information and belief, upon the changing of said locks, prohibiting the plaintiffs' from entering into their own home and excluding them from access to their own possessions and property, the only entities with access to the plaintiffs' home were Wells Fargo and NFR, their agents or contractors.

69.75. Both defendants were then in control and possession of the plaintiffs' personal property and home, specifically to the exclusion of the plaintiffs.

70.76. As such, the defendants were the only parties capable of protecting the plaintiffs' belonging from theft or damage.

71.77. At the time that NFR, through its actions or the actions of its agent or contractors and upon the authority given to it by Wells Fargo, entered upon the plaintiffs' home, it observed, as any reasonable person would, that the plaintiffs' personal property remained in the home and it had, in fact, not been abandoned.

72.78. Upon observing this, neither NFR nor Wells Fargo made any reasonable attempt to telephone, email or write the plaintiffs to inform them that the lock-out had taken place and that their belongings were no longer available to them without first obtaining consent and permission from NFR or Wells Fargo to enter into their own home.

~~73.~~79. Upon discovering that they had been locked out, the plaintiffs immediately contacted Wells Fargo to determine what change had occurred to result in them not being permitted into their own home and able to take possession of their own personal property.

~~74.~~80. Upon information and belief, an employee of Wells Fargo admitted to the plaintiffs that Wells Fargo had incorrectly believed that the home had been abandoned and that it had taken steps to effectuate the locking out of the Bittingers from their home.

~~75.~~81. Unable to enter their own home without breaking into it and causing further damage, the plaintiffs were required to wait until Wells Fargo delivered to them keys allowing them to reenter their own home.

~~76.~~82. During that period of time, Wells Fargo and NFR maintained control of the plaintiffs' home and custody of their belongings, to the exclusion of the plaintiffs.

~~77.~~83. During that period of time, the defendants owed a duty to the plaintiffs' to protect and keep reasonably safe the plaintiffs' personal property and valuables.

~~78.~~84. The plaintiffs were eventually sent a new set of keys from Wells Fargo, to allow them entry into their own home.

~~79.~~85. It was then that the plaintiffs' discovered that many of their belonging were damaged and/or stolen, including but not limited to:

    a. Their safe being destroyed and pried open;

    b. Jewelry, cash valuable coins, watches, wedding rings and other items belonging to the Bittingers were stolen, many of which were irreplaceable family heirlooms;

    c. The container holding Mr. Bittingers' father's ashes had been molested and disturbed;

d.  Camera equipment;

e.  Various clothing;

f.  Various electronics;

g.  Assorted military memorabilia collected by Mr. Bittinger's over his 22 years of military service, and

h.  Damage to the property was observed.

~~80.~~86.  Upon information and belief, the theft of the plaintiffs' items occurred while they were locked out of their home and while the Premises was under the exclusive control of the defendants.

~~81.~~87.  This is due to the fact that the plaintiffs were visiting their home with enough frequency, care and regularity that they would have noticed that their items were stolen prior to the date when the defendants undertook the efforts to lock them out of their own property.  Every time the plaintiffs visited their home, they left it in order, <u>with the possessions that were stolen, left intact on the premises.</u>~~.~~

~~82.~~88.  This incident, among other things, caused the plaintiffs to have to move the foreclosure court to extend the law date in order to afford the plaintiffs additional time to move their belongings out and responsibly turn over possession to Wells Fargo.

~~83.~~89.  The Bittingers moved to open the judgment of the foreclosure on March 24, 2014 which was granted and extended their law day and rights to actual and peaceable possession of the premises through July 1, 2014 (Cosgrove, J.).

~~84.~~90.  Upon the Bittingers becoming aware of this unlawful entry and removal of their personal property the Bittingers filed a report with the local police.

~~85.~~ 91.    The Bittingers contacted representatives of Wells Fargo and protested the actions of Wells Fargo and its agents to no avail.

## V. CAUSES OF ACTION

**FIRST COUNT:** ~~As to Wells Fargo Bank, N.A. (Breach of Contract)~~

~~1-86.   Plaintiffs, Bittingers, reassert each and every allegation contained in Paragraphs 1 through 86 and incorporate the same as if set out in full herein.~~

~~Upon entering into the Mortgage agreement with Wells Fargo, Wells Fargo and the plaintiffs were party to that contract and subject to its terms.~~

~~Under Section 7 of the contract, if Wells Fargo believed it had reasonable cause to conduct an interior inspection of the plaintiffs' home, it was required to give the plaintiffs reasonable notice at the time of, or prior to, the interior inspection.~~

~~Wells Fargo was also required to specify to the plaintiffs the reasonable cause it claimed justified their interior inspection.~~

~~By failing to even so much as bother to call the plaintiff's to notify them that Wells Fargo, through its own actions or the actions of the its agents or contractors, Wells Fargo breached this obligation.~~

~~Further, under Section 9 of the Mortgage, while it confers upon Wells Fargo the authority to secure the property, Wells Fargo was required to do so in a "reasonable and appropriate" manner.~~

~~There were no known exigent circumstances, e.g., weather event, impending threat upon the premises, known active vandalism on the property that Wells Fargo was aware of to~~

warrant their locking the plaintiffs out of their home without first attempting to easily verify that the plaintiffs had in fact abandoned their home.

A "reasonable and appropriate" manner required that Wells Fargo maintain some safeguards as custodian of the plaintiffs' belongings and personal property when they set actions into motion that resulted in the plaintiffs' being deprived of their property.

Wells Fargo entered the Bittingers' property and/or directed its agent or contractor in doing the same, without adhering to the conditions set forth in the Mortgage contract.

The Mortgage does not permit Wells Fargo and/or its agents or contractors to remove personal property from the plaintiffs' home.

Upon information and belief, the Bittingers' property was removed by either Wells Fargo itself or NFR as its agent or contractor.

Moreover, it was not reasonable and appropriate to lock the plaintiffs out of their own home as Wells Fargo had been put on notice multiple times through the parties' dealings with one another and the efforts made through the court administered mediation process, that the plaintiffs still maintained possession and control of their home and intended to maintain said control until the passing of their law day.

Due to the fact that the plaintiffs, by law, were permitted to retain possession of their home until the passing of their law day and Wells Fargo obtaining an order of ejectment under Connecticut General Statutes §49-22, Wells Fargo failed to exercise reasonable care under the terms of the contract.

These breaches by Wells Fargo and its failure to satisfy the condition precedent to their right to enter the plaintiffs' home, as described, unlawfully kept the plaintiffs out of their

home, separated them from the valuable possessions and led to the actions that resulted in the theft and destruction of the plaintiffs' personal property.

As a direct and proximate result of said conduct the Bittingers have sustained damages, in an amount according to proof at the time of trial.

**SECOND COUNT: As to Wells Fargo Bank, N.A. (Ordinary Negligence)**

1-100. Plaintiffs, Bittingers, reassert each and every allegation contained in Paragraphs 1 through 100 of Count One and incorporate the same as if set out in full herein.

The various legal relationships between the plaintiffs and Wells Fargo established a duty of care that Wells Fargo was required to adhere to in dealing with the Bittingers as consumers and Borrowers under the Mortgage, as well as defendants in the foreclosure action.

As set forth herein and above, Wells Fargo owed the plaintiff the following a standard of care, which includes one or more of the following duties:

To adhere to the regulations and principals set forth in the Guide;

To make a reasonable attempt to contact the plaintiffs after years of communicating with them without issue in the foreclosure mediation program, to let the plaintiffs' know that Wells Fargo believed the property had been abandoned;

To adhere to the terms of the Mortgage contract;

To not dispossess the plaintiffs of their home without the passing of the law day and obtaining an order of ejectment under C.G.S. §49-22;

To take adequate steps to protect and safeguard the plaintiffs' personal belongings once Wells Fargo, either through its own actions or that of its contractor or agent, took custodial control of the plaintiffs' home;

20

To notify the plaintiffs that Wells Fargo, either through its own actions or that of its contractor or agent, had taken possession of their home and observed the plaintiffs' belongings still in the property;

To adequately investigate whether the plaintiffs had in fact abandoned their home, which would include, but is not limited to, a simple phone call or email to the plaintiffs to make them aware of the concern for abandonment;

Wells Fargo breached the foregoing duties of care to the detriment of the plaintiffs, by failing to conduct itself in a manner that satisfied said duties.

Said breaches caused the plaintiffs to have suffered actual damages and injury in an amount according to proof at the time of trial.

**THIRD COUNT: As to Wells Fargo Bank, N.A. (Negligent Hiring, Training and/Supervision)**

1-91~~104~~.    Plaintiffs, Bittingers, reassert each and every allegation contained in Paragraphs 1 through 91~~104~~ of ~~Count Two~~this Amended Complaint, and incorporate the same as if set out in full herein.

92. Wells Fargo holds and services a large number of mortgages across the country.

93.    As such, Wells Fargo handles numerous judicial foreclosures that span across several states.

94.    A routine process of servicing mortgages and litigating foreclosures is to take possession of a borrower's home, such as the Bittingers' home in this matter.

95.    Wells Fargo often employs the services of a third party, either as agent or contractor, to assist them in securing a borrower's home, either pre- or post-foreclosure.

96.     Wells Fargo is aware of past incidences where said third parties employed by them to secure the properties, have been accused of stealing from the home owners.

97.     Upon information and belief, they have also been involved with litigation that involved NFR and accused both Wells Fargo and NFR of conduct such as conversion, negligence, theft, and trespass.

98.     Therefore, Wells Fargo was aware or should have been aware that there is a degree of propensity for this type of behavior to take place when employing a third party to exercise their held rights under the Mortgage contract.

99.     Wells Fargo had an obligation and legal duty to the plaintiffs, as consumers, borrowers, and owners of the personal property they were going to affect, to select and review the experience, suitability, and fitness for the job, and overall competency of its employees, agents and contractors.

100.    Wells Fargo owed a duty to the plaintiffs to evaluate and supervise the quality, interaction and services performed and rendered at their direction and on their behalf by third parties, and that Wells Fargo knew would contact, interact with and affect the plaintiffs' property rights and access their home and their property.

101.    This duty also stems from the fact that Wells Fargo was aware of and involved in claims against third parties it had hired, including but not limited to NFR, wherein those third parties were accused of conduct similar to what the plaintiffs allege occurred against them in this action.

102.    Upon information and belief, Wells Fargo breached their duties to the plaintiffs by hiring NFR to perform services and take actions on their behalf, including but not limited to failing to ensure that NFR and its employees, agents or contractors were properly trained, experienced,

supervised, competent or capable of following through with Wells Fargo's intent to secure the premises and lock the plaintiffs out of their home.

103.    Further, upon information and belief NFR, its agents and/contractors were not properly instructed by Wells Fargo as to how to undertake possession of the plaintiffs' property to ensure that it was not done in a manner that was in violation of the mortgage contract and applicable law.

104.    Wells Fargo failed to have procedures in place that instructed NFR to make a reasonable determination of whether the property was in fact abandoned and, if it appeared that it was not, take certain actions to notify the plaintiffs.

105.    In addition, adequate safeguards were not put in place by NFR, acting under the instruction and/or supervision of Wells Fargo, to protect the plaintiffs' personal property once Wells Fargo, through the actions of NFR, became custodian of said property.

106.    As a result of this breach, plaintiffs have suffered actual damages and injury in an amount according to proof at the time of trial.

**~~FOURTH~~ SECOND COUNT:    As to National Field Representatives, Inc. (Conversion.)**

1-10~~4~~6.    Plaintiffs, Bittingers, reassert each and every allegation contained in Paragraphs 1 through ~~104~~ 106 of Count ~~Two~~ One and incorporate the same as if set out in full herein.

107.    NFR, on its own behalf or through the action of its agents, representatives or independent contractors took personal property of the plaintiffs, with the intent to keep said property as their own and in derogation of the Bittingers' ownership rights in said property, and

said NFR, by its agents, representatives or independent contractors wrongfully detained and wrongfully exercised dominion and control over said property.

~~107.~~108.    NFR is liable for the plaintiffs' missing property.

**~~FIFTH~~ THIRD COUNT:  As to National Field Representatives, Inc. (Statutory Theft.)**

1-~~106~~108.    Plaintiffs, Bittingers, reassert each and every allegation contained in Paragraphs 1 through ~~106~~ 108 of Count ~~Four~~ Two and incorporate the same as if set out in full herein.

~~108.~~109.    NFR, its agents, representatives or independent contractors stole personal property of the Bittingers.

~~109.~~110.    NFR is liable to the Bittingers for treble damages pursuant to Connecticut General Statutes §52-564.

~~110.~~111.    NFR's liability for the conduct of its agents, representatives or independent contractors is a result of its failure or indifference to adequately train and supervise them under circumstances in which it could be substantially certain that such illegal conduct would occur.

~~111.~~112.    This conduct has resulted in the plaintiffs' injury.

**~~SIXTH~~ FOURTH COUNT:  As to National Field Representatives, Inc. (Negligence)**

1-~~110~~112.    Plaintiffs, Bittingers, reassert each and every allegation contained in Paragraphs 1 through 112~~0~~ of Count ~~Five~~ Three and incorporate the same as if set out in full herein.

~~86.~~113.    As the contractor and/or agent of Wells Fargo, NFR owed a duty to Bittingers to act, or to ensure that any of their agents and/or contractors act, in an appropriate and reasonable manner with regard to the foreclosure of the Premises.

~~87.~~114.	This duty of care is concomitant with the same duties and obligations as Wells Fargo since Wells Fargo's rights stem from the Mortgage contract and their position as lender to the plaintiffs.

~~88.~~115.	NFR by itself or through its agents or independent contractors, breached its duty to the Bittingers by: failing to acknowledge the fact that the Bittingers' property was still in its redemption period and NFR had no lawful basis for re-keying, entering or removing personal property from the property; failing to act in a reasonably prudent manner after NFR, and/or its agents or independent contractors were aware, or should have been, that the Premises were occupied; and violating its own internal policies which would have required a Court Order before any personal property items were removed, even if the property had not been redeemed.

~~89.~~116.	As a proximate result of NFR's negligence the Bittingers were caused to suffer damages.

## VI. PRAYER FOR RELIEF

1.     A temporary and permanent injunction enjoining Wells Fargo Bank, N.A. from collection on the note based upon their misconduct in the handling of the foreclosure and the invasion of the plaintiffs' rights as herein alleged.

2.     Compensatory Damages.

3.     Damages as allowed and specified by each relevant Statute;

4.     Treble Damages in accordance with C.G.S. §52-564.

5.     Punitive Damages;

6.     Interest;

7.     Attorney's Fees;

8.     Such other relief as this court deems fair and just.

## VII. DEMAND FOR JURY TRIAL

In accordance with Federal Rule of Civil Procedure 38(b), Plaintiffs respectfully demand a jury trial of the within action.

Dated at New London, Connecticut this 19th day of September, 2017.

Respectfully Submitted,
PLAINTIFFS, ROGER BITTINGER and
LILIAN BITTINGER

By:       _____/s/_____
MICHAEL S. BONNANO, Esq,
GERAGHTY & BONNANO, LLC
38 Granite Street, P. O. Box 231
New London, CT 06320
(860) 447-8077 / Fax (860) 447-9833
(Federal ID #Ct25847)
Attorney for ROGER BITTINGER and
      LILIAN BITTINGER